First appeal we'll hear this afternoon is docket number 24-1821, AG 18 v. DK Crown Holdings. Mr. McKeever, please begin whenever you're ready. We will be holding all counsel to their time allotted. May it please the court. Patrick McKeever on behalf of Appellant AG 18 with me as my colleague, Jonathan Tietz. There are three topics I plan to address this afternoon. The merits of Claim 12 and Draft King's collateral estoppel argument on appeal. Starting with Claim 17, the board construed the results calculation module in Claim 17 as a means plus function element with corresponding structure that included an algorithm from the patent specification. But when the board analyzed the prior art, it failed to apply the corresponding structure from its own construction. Specifically, the board's construction included as part of the structure steps for determining the objectives achieved by the player and the competitors. At Appendix 72, the board stated, we agree with this additional component of the algorithm. By including those steps. Objectives means it has to be something that's different than the outcome of the game. Yes, so the 498 patent distinguishes between the objectives and the outcome. I would say the outcome would be the result. I think the term that the 498 patent uses is result. That's the result calculation module. The term outcome, I believe, just comes from the ametis prior art reference. And what the 498 patent describes is that the result calculation module performs steps and those steps include looking at which objectives were achieved by the player and which objectives were achieved by the competitors. And how is that any different from determining the results of the game and who won, who lost, and who gets paid and who doesn't get paid? Well, so the result in the context of the patent is based on the objectives that are achieved by the different players. So wouldn't the objectives achieved, as you would have it, necessarily be resolved in order to figure out the results? I don't think so. And if you look at the ametis prior art, I think it actually disproves that notion. Ametis says that... Where below did you really make it clear to the board that objectives achieved is a very different animal from the actual results and outcome of a game? I didn't see that. I didn't see it in your blueberry. So, you know, I could understand perhaps why the board might have been left to wonder, is there really anything to this in terms of a real distinction between objectives achieved and results gained, especially in light of, say, I don't know, is it figure six? This incredibly simple looking flow chart, which to me, when it talks about objectives achieved, it really feels like it's being used interchangeably with the results of the game. Well, so the ametis talks about how the gaming server in ametis determines an outcome. And it gives us an example for how you would determine... I didn't really answer the question first. The question was, did you make that argument below. So I think you should be identifying where you made that argument below. Yes, Your Honor. I'm looking at the patent owner response, which begins at Appendix 378. Maybe 408 or 409? Yes, Your Honor, that's where I'm looking. So in 408, we cited the disclosure from the 498 patent in column 12, which is describing figure six. And then obviously we have excerpted figure six there as well. Very simple flow chart. Right. And I think that's... At this point, Your Honor, the main point we were arguing was that this algorithm is corresponding structure because DraftKing's position in its petition and what its expert addressed was simply that the corresponding structure was only a server. So we were pointing to this to identify this is disclosure of an algorithm in the patent specification, that that should be included as part of the corresponding structure. There hadn't really been a dispute at this point about the difference between objectives and... I mean, the way this proceeding evolved, it seemed like the patent owner was saying, well, part of an algorithm, assuming there is an algorithm here, I have doubts about that, part of the algorithm is determining objectives achieved by a given player. And that language is different from determining the results for a given player. And the other side was saying, no, figuring out the outcome for each individual player encompasses objectives achieved by a player. And then it became a fact-finding call for the board. And the board, as far as I can tell, wasn't presented with any real explanation why objectives achieved must be something separate, independent, and unrelated to results and outcomes for a given player playing one of these betting games. And so, therefore, found that Amidus, in fact, discloses this by having its gaming server determining the results and outcome for all the players, and then determining what the payout should be for all the different players, if any. So, therefore, it feels very much like a substantial evidence question. Where would you say that I'm off base with that? Well, I would say that there really was no substantial evidence equating anything in Amidus with the corresponding structure that the board adopted in its construction. Now, the board's construction has not been challenged on appeal. And although DraftKings made an argument in its reply brief below that even if this corresponding structure is required, which the board ultimately found that it was, that Amidus still discloses the limitation. But simply by pointing to Amidus's bare disclosure of determining an outcome. Now, their expert, they could have had, at that point in time, their expert explain why determining an outcome is the same as determining which objectives are achieved. They didn't do that. They didn't even have to say anything about this. Oh, objectives achieved in our planned algorithm is a very different species from whatever Amidus is teaching about determining the results and outcome of the game for the players and determining who won or lost and how much the payoff would be. Right. I think he addressed the disclosure of the algorithm and said that it was required, the corresponding structure. But I don't think he got into construing what the objectives are as opposed to the outcome. You're running out of time. Are there other arguments you want to present? Yeah, I'll shift to argument 12. Sorry, the argument for claim 12, Your Honor. So the board erred in its analysis of claim 12 by conflating evidence of transmitting with a requirement in the claim for receiving. Claim 12 requires a system with at least one processor that executes instructions from a memory to perform a number of different functions. The system also includes at least one communication interface. And three of the claimed functions involve using that communication interface to send certain information or receive certain information from other devices. The key one that's disputed here, Your Honors, is limitation 12M, which recites receiving data about the game from the gaming server through the communication interface. Now, DraftKings said that it was relying on the network interface of the gaming server in Ametys to disclose all three limitations, communication interface limitations, in claim 12. And here's what DraftKings actually argued below. The network interface of Ametys' gaming server facilitates the gaming client's reception of data about the game from the gaming server as recited under limitation 12M. In other words, the gaming server's transmission of data about the game to the gaming client satisfies limitation 12M because that data is transmitted through the communication interface of Ametys' gaming server. That's Appendix 441. So DraftKings effectively said the server transmitting data to the clients through its communication interface counts as receiving game data through that server interface. But this argument has no merit because transmitting and receiving are clearly not the same thing. We don't pretend a pitcher receives the baseball when he facilitates receipt by the catcher by throwing the ball to the catcher. If I send... My understanding of the petition and the board's decision is when there is a transmission from x to y and that data transmission necessarily goes through a series of components before it arrives at y, then necessarily that y is receiving the data through each of those components. The data passes through each of those components and so therefore it could be said reasonably that the device y is receiving the data through any and all of those components. What's wrong with that? Because it conflates receiving with transmitting. Again, if I drop a birthday card for my niece in the mailbox, she doesn't start receiving it the moment I drop it in the mailbox. She receives it when it actually arrives to her and so the idea that... What if I'm a company in Japan, in Tokyo, and I've got a big manufacturing plant and I say I need and consume a lot of crude oil and I receive my oil through the Strait of Hormuz. Is there anything wrong with saying it like that? I think it would depend on the facts. If they actually took title to that oil when the oil left wherever it was coming from, then I think it would be fair to characterize that part. It seems like a reasonable thing to say. I received my oil through the Strait of Hormuz. I think in this instance where we're talking about a communication interface or a network interface of two different computing devices, a person of skill in the art and Dr. Lane did address this and I can point to that. A person of skill in the art would recognize that those two devices have their own communication interfaces and the transmitting happens at the communication interface, the network interface of the device that's sending the data and the receiving happens at the network interface of the device that's receiving the data. Mr. McKeever, you're into your rebuttal. Do you want to save it or do you want to keep going? I'll reserve what's left. Okay. Thank you, Your Honor. Let's hear from the other side. Thank you, Your Honor and may it please the court. With respect to claim 17, the board made a factual finding that the algorithm that is disclosed in the 498 patent, such as it is, would be practiced in the combination involving MIDUS. That's all the board had to do. So the claim structure here is the algorithm, the algorithm which is described in figure six, as Judge Chen, you already noted. There's not much more in the specification about that. I mean, the specification recites essentially the same thing. It's a sentence about that step. What do you think the board meant when it said objectives achieved is an additional component to the algorithm, i.e. the corresponding structure? Yeah. I think what they meant there is that it's not sufficient to get the random number generator from the random number generator machine. You have to then compare it to what the wager was and determine if there was a match. I think that's what they meant. That seems consistent, by the way, with how our expert talked about it. The expert testimony was expressly relied on by the board. Mr. Nicely's testimony is mentioned several times at pages 73 and 74 of the board's decision. And what he explained there is that when MIDUS teaches this notion of calculating the results of an outcome, what happens is you determine, and here I'm going to be reading from, this is our expert's declaration. It's paragraph 214 of his declaration, which is on, I think, appendix page 24, 73, and 74. But what he did, he's quoting essentially from MIDUS and saying, MIDUS determines the outcome of a game. By the way, I should say, this is analyzing claim one. So the analysis here actually started in claim one, and then that was relied upon for claim 18. So that's why I'm reading from this paragraph. So he's talking about MIDUS here in terms of this step, which is collecting results of the game. But he goes on to say, determining an outcome of the game being played, citing from MIDUS, MIDUS also discloses that the outcome can be generated by accessing another server and or software application and retrieving information such as receiving results from a random number generator to determine the outcome of the game, i.e., whether the user won or lost. The gaming server then determines an amount won or lost based on the amount wagered. And that last sentence is a citation from paragraph 104 of MIDUS. So it's not just what happened, you know, what did the slot machine show? It's, is that what the user bet on? Compare it to what the wager was, and then that determines the outcome of the game. I think that's what the board meant. I mean, again, none of this was really below, but... You're interpreting the claim through what the prior art discloses. That's the thing that I got lost on. I'm trying to, I'm asking you, what's the best understanding of what the board meant when it construed this means plus function limitation and said that the corresponding structure, apparently, maybe above and beyond calculating results is an additional component to the algorithm called figuring out the objectives achieved by a player. Is that a separate, independent, unrelated thing from determining the results? Well, the board concluded that it was based on the spec and that flowchart, right? So they said that's an additional step of this algorithm that had to be part of the claim structure. What did they mean? I'm not, I'm not meaning to interpret the prior art. I'm trying to show how I think the board was applying the prior art to that algorithm. But I think it's the same thing because, you know, it's a wager, there's a bet, right? This is, I mean, there's nothing unique here about the games here. These are just casino games. So the user is going to make a wager, which is a prediction about something that's going to happen in the future, and there's a certain amount of money associated with that. Then the thing happens or not, and then you compare that to the wager and determine if they won. So it's really two steps. Did the thing happen? And then what was the wager? And you compare those two and you come up with an outcome. Excuse me, you come up with what the objectives were and whether the objectives were satisfied. So I think that's what they meant. But again, it's admittedly unclear because none of this was really addressed by the brief below or in the final written decision. But what is clear is the board found, you know, there is this structure, it is this algorithm, and then the board expressly found, based on Mr. Nicely's testimony, this is at appendix page 74, concerning structure, we are persuaded by petitioner's contention and Mr. Nicely's testimony that a person of ordinary skill in the art would have implemented the algorithms of the in a MIDUS as part of the gaming service provider. So whatever those algorithms are, whatever the board was saying is necessary for this claim to be satisfied, it's saying, we find it would be obvious to put that thing into a MIDUS. There's certainly substantial evidence for that finding, so I don't think there's any basis to challenge it on appeal. Certainly the claim construction is not being challenged. So it's Nicely paragraph 271, which refers to MIDUS paragraph 104? 271, I think that's a cross-reference to 214. He actually, if you look at 271, it's a citation to section. Yeah, correct, correct. He doesn't give a paragraph number. Correct. That's 214 is the paragraph I just read to you a moment ago. Yeah, correct. So that's what I conclude about claim 17. I think there's substantial evidence for the board to have reached this conclusion that whatever this structure is that's being claimed, it's obvious to put that structure into a MIDUS. So I don't think we have to go further and try to deduce what that additional meaning is, but the extent you want to, that's my explanation. I think that's what they meant, that it's not just what did the random number generator say, but what was the wager associated with this event? Match them up, decide, was this better as objectives achieved or not, and then pay out. Unless there's any more questions about that claim, I'll turn to claim 12. Did the board improperly mix up transmitting data and receiving data? In claim 12? No, it's very clear that they understood what was going on there. What they said was the actual disclosure of a MIDUS is the transmission going from the game server, and they do this with respect to figure nine, right? The transmission goes up from the game server to the client device where the user is doing his gaming, playing the game essentially on his phone or his device, whatever it is. So it's true that the discussion of the MIDUS is about the transmission, at least with respect to this particular element. He's talking about transmitting up to the client device. What the board said is, well, what the board's clear implication of what they're saying here when you look at page 56 and 57 of the Thyman decision is, what's going on there is the client device is receiving that transmission, right? Did the user win the game or not? The user's got to be told, did you win the game or not? And that's the transmission that's being talked about in the MIDUS. The fact that a MIDUS doesn't expressly say, I send the data from the client device, and then the client device receives it and displays it is irrelevant, because the board found a person of ordinary skill in the art would have understood that's what's being explained in that section of a MIDUS. There's no other reading of a MIDUS that would make sense. You wouldn't send the results to the user, and then the user never gets them, right? I suppose the patent owner must be arguing that the claim says the client device receives data through the communication interface. He necessarily must be referring to the client device's own network interface, not the network interface for the server. Well, that's a claim construction argument that perhaps they could have made but did not hear. They sort of made a claim construction argument to that effect to the board, which was rejected. The board said, look, that's not what you claimed. It just says, look at the claim. It just says receive data about the game from the gaming server through the interface. That's satisfied by the gaming server using its own interface to send the data to the client. Nothing wrong with that, and the board, I think, explained that quite well in its final decision, starting around page 57. I think those are the only two issues that my colleague addressed, so unless there's any other questions, I will yield back. Okay, thank you very much. One question. Are you going to want us to switch just for planning purposes? That would be fine. Stay where you are. Okay, thank you. Mr. McKeever. Just a few points in rebuttal, Your Honors. So first of all, during his argument, Mr. Williams pointed Your Honors to Appendix 74 from the board's final written decision, and I believe, if I was following this section they were referencing, pointed to the top paragraph in that section. That's what they pointed to repeatedly in their red brief, but the paragraph that specifically addresses the results calculation module is actually the following paragraph, which begins specifically concerning the results calculation module, and in that paragraph, beyond the section recounting patent owner argued, there is no citation to Mr. Nicely's testimony, petitioner's expert anywhere, and the reason for that is because Mr. Nicely did not address, I mean, he really didn't address corresponding structure under any construction. I mean, as I think Your Honor just referenced, you know, his declaration essentially just points back to the discussion of a non-means-plus-function element in Claim Limitation 1K. In the paragraph you're referring to on 874, isn't there a parenthetical citing to Nicely? Yeah. Is it in 1003? And then a bunch of paragraphs from the Nicely declaration, including 271. Right. Where Nicely is referring back to his earlier discussion on Limitation 1K. I believe that's right, Your Honor, but that's actually part of the parenthetical, explanatory parenthetical of what patent owner argued. That's a citation to our brief and what we were referencing in our brief, not, you know, a citation to where... It was your, you know, they're citing your attempted rebuttal to all the arguments contained in the petition, which was relying on Nicely Exhibit 1003 and a whole series of Nicely paragraphs. Okay. Last point I was going to make, Your Honor, if I have a moment, is just on Claim 12, the idea of shifting and saying that the receiving can be done at the gaming client devices, as we argued in our gray brief, also would run afoul of the processor limitation. Look at the structure of the claim. There's a processor that performs all of those functional steps. They relied on the processor of Ametis' gaming server as meeting those limitations. But as Mr. Williams just argued, and as the board sort of went back and forth in this decision, it seems like they're actually saying the receiving happens not at the gaming server that's transmitting the data, but the receiving happens at the client. But those devices would not have the same processor. Thank you very much.